Next case is Galderma Laboratories, L.P. v. Amneal Pharmaceuticals, L.P. 2019-1021-1093. Mr. Lombardi. Good morning, Your Honors, and may it please the Court. I intend to address two issues. Of course, if Your Honors have questions on others, I'm happy to address them too. But two main issues as part of this appeal. The District Court made error with respect to its ruling on the Chang patents by not properly applying the Doctrine of Prosecution History Estoppel and not giving effect to clear and unmistakable statements concerning the scope of the invention. And with respect to Ashley 2, the District Court erroneously applied Doctrine of Equivalence and found infringement on Doctrine of Equivalence when that issue was not tried. I will start with the Chang patents. And with respect to the Chang patents, I don't think that there's much of a dispute that Chang, the patentee, the applicant, gave up a delayed release portion that releases in the stomach. They made that statement. I agree. They made the statement clear as day. And if those statements were all this record contained, I would be with you 100%. You don't have to regurgitate the statements. There are many of them, and they're clear. They were trying to get, in order to overcome Seth, which leaks. By the way, if I start to approach, you have a lot of things marked confidential. If at any point you think I approach on anything that's confidential, wave your hand, jump up and down, do something, I'll try to stop. I think I know where those lines are, but I'm not positive. I appreciate the answer. Raising your hand is better than jumping up and down. I'm not sure I could jump up and down. Well, in any event, so Seth leaked some of its extended release in the stomach. So they wanted to get over Seth. So one of the ways they attempted to do so was by saying, oh, no, when we use the word delayed release, it means nothing in the stomach, nothing until you get to the intestines, outside the pH of the stomach, nothing. And I understand that this product kind of arguably works like Seth. So there's no doubt in my mind that all of those statements amount to disclaimer in isolation, but we're supposed to read the prosecution history as a whole to figure it out, and in the end, on pages 17-023 and 17-024, the board, rightly, by the way, I think, rejected that construction argument and said, no, delayed release, there is no plain meaning of delayed release that we can find that requires it to not release until after it leaves the stomach. Delayed release, and they cited a number of exhibits, always means release anytime not promptly after administration, which means you can have some release in the stomach. Now, the board went on to find they overcame Seth for other reasons, but the board, the patentee made statements attempting to define a term differently than the normal meaning, and the board rejected those attempts clearly and unequivocally. So my problem for you is I walk away from this prosecution understanding that they were not allowed by the PTO to give that term the construction they wanted to give it, and it would be given a broader term. So my problem is prosecution history is stoppable. Part of the purpose of that is notice to the world. I want to put the world on notice as to what the scope of this claim will and will not cover. So when the board has clearly and unmistakably said no, that is not the construction, how is the world on notice that no, we're going to find the patentee to its earlier assertions, even though the board expressly rejected them? I'm sorry that took a long time. That's okay, and I don't dispute any of the facts that you talked about. I do dispute the conclusion, and that's because prosecution history is stoppable is oriented towards what the patentee, what the applicant said. It's not oriented to what others said, and that's shown up in the case law, the POTS case, the South Walk case. The problem is all of those cases you point to, and I read every single one of them, what they have to do with is not allowing the patentee to be bound by something the PTO says that the patentee didn't embrace or accept. You know, those cases where it says, no, prosecution history is stoppable can only occur based on something an applicant says. It can't affect the applicant. It can't hurt the applicant when an examiner states something about it that the applicant doesn't accept or endorse. Do you agree with that characterization of the case law? I don't, Your Honor, and I think what the case law shows is, well, I think I should talk broadly, but I think if we talk about POTS and South Walk, in those cases, the patent owner made distinctions of the prior art. The patent office didn't even rely on those statements. Yeah, but what about a case, American Piledriver, to me, seems to be the closest case. That's a case where an argument was made that Integral should have a single-piece construction, and the patent office said, no, we're not going to give Integral a single-piece construction. And yet, nonetheless, this court, among with other evidence, relied on that statement by the patent owner in interpreting the meaning of the word Integral. Exactly, and that is, I think, our strongest case, on the point that it is not what the patent office said. Except the difference, a really big difference between that case and your case is the court in that case said all of the intrinsic evidence, all of it, the claims, claim differentiation, and the spec, pointed to the construction, the same construction the patentee was arguing. And the court was de novo deciding what the construction should be, and then the court said, moreover, the prosecution history takes away any doubt, clearly they didn't have any doubt because they went through all the evidence and said it all pointed in one direction, because they said, because during prosecution, even the applicant said this is the plain meaning to be given. So, doesn't that seem quite a bit different? Because in that case, every piece of evidence pointed to that definition, and here, no piece of evidence points to the definition that the patentee wants to give it. But, Your Honor, I think the point here, the question here, is what the patentee said, not what the patent office. I think it should be what a skilled artisan takes away. From what the patentee said. From the prosecution. Well, I think that the cases indicate that it is what the patentee said that we looked at. We do look at what a reasonable competitor would conclude based on the prosecution history and what the patentee said. But that's why American Piledriver is strongly in our favor, because in that case, the patent office actually went against, denied what the patentee said. But the patentee was still held to what they said. No, they weren't held to it. The court said every piece of evidence in the case pointed to that being the correct construction. They weren't held to it. There's nothing in that case that says we hold them to it. It's not the plain and ordinary meaning, but we're nonetheless going to hold them to it. What is the claim construction in this case, by the way? I don't think that the claim construction is limited to the position that the patent owner took in the prosecution history. Am I right about that? The claim construction on delayed release is that essentially anything that does not immediately release. In other words, your view is that 8 milligrams of sustained release is not delayed release. That's true, Your Honor. But claim construction is not the issue here. We're on prosecution history estoppel, which isn't the claim construction point. They didn't have a literal infringement case to bring on change. They brought one. They tried to bring one, but it was late, right? Yes, that's right. They tried to bring one, and I think it's fair to characterize it as the district court found it to be waived and wouldn't let them go forward and struck their contention. So we don't have a literal infringement case here. All we have is a doctrine of equivalence case. So all the talk about claim construction in this case I don't believe is relevant to the issues, Your Honor. What's relevant to the issues is whether prosecution history estoppel to the doctrine of equivalence infringement case that they're making. So you think none of the claim construction is relevant to this and prosecution history estoppel should be treated differently, yet you're telling me I should follow piledriver, which was a claim construction case? Well, Your Honor, I think... Do you not see just a tiny bit of hypocrisy in that? Well... And hypocrisy is too harsh a word. I'll take it back. I agree, it's too harsh a word, Your Honor. But I do think that prosecution history estoppel and prosecution disclaimer, and I concede that American Piledriver was a prosecution disclaimer case. That is correct. No, it was a claim construction case. It wasn't a prosecution disclaimer case. Well, correct, Your Honor, correct. But my point is that prosecution disclaimer arises in the context of claim construction. But I think that the important points here are similar between prosecution history estoppel and what goes on in the claim construction context. You look to see what the patentee said about its invention, about the scope of its invention. But even when the examiner... And see, I agree with you. In any case where it's at all ambiguous, I would 100% be in your favor. Like if the examiner said, well, I don't know about that. Or if the examiner said, well, even if true, it doesn't overcome your reference. Or if the examiner left any ambiguity, but here we're on pages 17, 023, and 024, they say, we understand your argument. They articulate the argument for how the claim should be construed. And they say, we unequivocally reject it. That is not a correct construction. We will not construe the claim that way. You still think that somehow a skilled artisan... Because what I'm worried about is confusion for skilled artisans down the road. You still think a skilled artisan who read that would understand that nonetheless, these claims are in fact limited to delayed release only occurring in the intestine, even though the examiner came along and said that is absolutely wrong. And that's what I worry about. What I worry about is that the rule of law that you're asking us to adopt in this case is going to create a lot of confusion down the road for ordinary skilled artisans who are going to walk away from the prosecution with a clear idea the patentee did not get what they wanted on this term. Not that they didn't overcome the rejection, but the board said no. And, Your Honor, respectfully, I think that the rule that you seem to be advocating would create more confusion. Because then, rather than it being based solely on the statements of the patentee, which I submit is what the law is now, we're now into the case of what did the PTAB say? Well, is that good enough, or do we have to wait until the Federal Circuit reviews what the PTAB said? Is that good enough, or do we have to wait until there's a motion on bond? Is that good enough, or do we wait for the Supreme Court to determine? Just to be clear, most of our cases, most of the fact patterns we get are nowhere near as clear as this one. This one is a beautiful fact pattern because you have really clear statements by the patentee, which if they all were in the record, I'd say, hands down, disclaimer. And then the clearest rejection I could imagine by the PTO. So maybe this is not a great case to make important law in because most cases are going to be fuzzy. So maybe this is the kind of case where we just say, in this case, giving these facts, here's what should happen. Well, I assume you're not arguing the distinction between comprising and consisting of. We are. We are arguing. That's the estoppel by amendment argument, Your Honor. And what happened there was that the claims very clearly were amended from comprising, and I'm paraphrasing, but comprising a DR and an IR portion to consisting of a DR and an IR portion. There's no dispute that our product goes beyond a DR and an IR portion. And they've made those, they've made... Which would have been encompassed by consisting of. Consisting of does not encompass our invention. Comprising would have. Yes, yes, yes. Comprising was broader. It got narrower. You have something more than the 10 and the 30. That's right. It would permit something more than that. In this case, we don't have just the 10 and the 30, just the IR and the DR, and so that is another basis for estoppel in this case, and that is the prosecution issued by amendment argument. The district court got that wrong because the district court got the presumptions wrong. Do you want to spend a minute or two, even though you're in rebuttal time on Ashley? I will, Your Honor. The basic point on Ashley was that, and I will say that this was without doubt a confusing case because of the number of patents. But the district court, unfortunately, ruled on a theory that was not tried. And we had this doctrine of equivalence theory on Ashley, too, that the district court decided on. Galderma did not open with that theory. Galderma did not present evidence on that theory. Galderma did not present experts on that theory. They did not present a closing on that theory, and when we said to confirm that this had not been tried, they did not rebut what we said. So it was simply not tried. The district court, we believe, based on the way the briefing was done, relied on something from factual presentation from the Ashley I patents instead of the Ashley II patents and came to a conclusion that there's doctrine of equivalence. But the problem is that the record has to have particularized testimony in linking argument as to the insubstantiality of the differences. That is completely lacking here, and so the Ashley II findings should be reversed. I have another question, going back to the argument-based estoppel. One of the concerns I have is, I'm sure you'll agree with me, that when a patent owner takes a particular position in claim construction, and it's a clear and unmistakable surrender, they can later retract from that. They can say something affirmatively and say, hey, the patent office didn't agree with my claim construction, so I am now taking the position that that is no longer my position of how the claim should be interpreted. My concern is this. What mechanism is there for a patent owner to submit such a paper in a circumstance like this, where you have an IPR proceeding with a final decision by the board? What kind of mechanism is there, if any, for the patent owner to say, hey, I retract. I no longer think that that's the right position. Because, come on, let's face it, everybody's going to want to do that. Yeah, and I think that when you need a mechanism, you make one. You submit something. You attempt to do it, at least. Do you know of a particular mechanism with the PTO? Because I know the PTO could say, hey, we have the right to not accept that paper. I realize no paper was filed here. There was no attempt. But I really am just even thinking about cases going forward. Do you know of any mechanism? I mean, this is not district court. I mean, district court, you do have a lot more opportunities to file papers. The PTO proceedings, as I understand it, from their trial guide, could be more limited in terms of what papers are allowed to be provided. Yeah, and I agree that there's a limitation. What I would say, Your Honor, is I can't answer that there is a specific mechanism, as I stand here right now. I cannot. However, the fact that it wasn't even attempted here, it wasn't even tried, shouldn't detract. That shouldn't get them off the hook for the statements they made. They're responsible for the statements they made. They know what they say in the file history is important and is going to be relied on by others, and they took those positions. And it shouldn't be the problem of the patent challenger to overcome their failure or their regret at positions that they took before. You were used all your time, Mr. Lombardi, but we will give you two minutes of rebuttal. Thank you, Your Honor. Mr. Flatman. Your Honors, may it please the Court. There's no confirmed conviction of a mistake by the district court here, and there's no allegation of clear error in the factual findings. Why don't we start with the Ashley patent? I am concerned that you raised DOE as no reduction of skin microflora, because I don't see you ever making that argument. Well, Your Honor, we did, and we also presented particularized evidence to the district court. Where did you make that argument? We, first of all, raised it in our pretrial briefing, and then we presented the evidence and testimony of our experts. Can you identify any particular record sites for that? Absolutely, Your Honor. Because if you're talking about the evidence with regard to sub-antibacterial amount limitation, that's a separate limitation and a separate claim. And I saw that you raised DOE with regard to that and introduced evidence on it, but I saw no argument or evidence on the microflora. Okay. Your Honor, just to give you the sites first for the pretrial order, that's A4540, 47, and 54, where we raised that we were going to attempt to prove doctrinal equivalence infringement of the Ashley 2 patents. I also raised equivalence... Do you want to show us? I mean, that would be very helpful for you here to actually go to A4540 and show us where it is. Oh, certainly, Your Honor. So at A4540, paragraph 41, we raised as an issue to be tried whether amnil infringes any of the asserted claims of the Ashley 572 patent under the doctrine of equivalence. That is the Ashley 2 patent, which contains the microflora,   And we raised that as an issue to be tried So just out of curiosity, if you have a patent claim with five elements and you argue particularized testimony to a jury or a judge that claim one is... Element one is infringed under the doctrine of equivalence and your expert says the function, way, and result of how element one is equivalent to what the accused device does, but you never say anything at all about element four, you never offer particularized testimony from any expert about function, way, and result with regard to element four, do you think you now have a right to have the jury find that the doctrine of equivalence has been satisfied with regard to element four? In this particular instance, yes, Your Honor, because the... Without any particularized testimony whatsoever, not even a conclusory statement by an expert that these two things are equivalent. Your Honor, respectfully, there was particularized evidence on this point, and I can explain. The no reduction in skin microflora term was similar and consistent with the parallel term no sub-antibiotic amount, which was the scaffold on which the experts put in their testimony, and that's because the non-antibiotic amount terminology required substantially no antibiotic activity in four areas of the body. One of those areas was the skin, and the evidence was presented at that point that there was no reduction in microflora of the skin based on the Skidmore study, which the judge relied on, in his opinion, as A49 to 50, and Example 38 of the patent, which the judge found to be the strongest intrinsic evidence of no reduction in microflora. So it was all presented chapter and verse. I'm sorry, what evidence is it? Your expert testified as to sub-antibacterial amount. He said, yes, it does, it functions the same way, and this is on A88 of the appendix, but I just don't see anything on microflora. I'm happy to point the Court to the relevant sections, and a couple of them are A5462 to 77, which is the Janelle direct testimony of our expert, Dr. Janelle, at A5465, page 171. A5462. Would it help if you just slow down for me? Certainly, Your Honor. A5462. Okay, so where is he testifying? Well, I gave you the range there, Your Honor. A5462 is four microfiche tiny pages, so maybe you could tell me what page in line that is. I will point you to some pin sites instead, Your Honor, which I think will be more helpful and more illustrative. At A5465, page 171. Okay. Let me just get there as well, Your Honor. This is the Skidmore stuff. Yes, so he's discussing Skidmore in particular and comes to the conclusion at lines 15 to 17, based on Skidmore, that the results were essentially that there was no difference between the doxycycline and placebo for any organism at either time. This is skin microflora, Your Honor, and he's presenting that because that is part of the first element. No reduction in skin microflora. If you go to A5467, just a little down the road at page 178, he concludes, based on Skidmore and the label, at line 22 to 23, the FDA concluded the same thing. It, that is a 40-milligram doxycycline, functions as a sub-antibacterial amount, and he goes on to talk about no detectable, on page 179, same appendix site, no detectable long-term effects on bacterial flora of four representative areas, one of which is the skin. Again, no reduction in skin microflora. Counsel, let's go to Chang. Certainly, Your Honor. How can 30 and 2? I didn't hear you, Your Honor. How can 30 and 2 plus 8, which is not DR, be equivalent to 30 and 10 DR? I'm being cautious here because it's not my confidential information, Your Honor. Counsel, let me proceed. Yes, so what the district court concluded was that the DR component consisted of, was built of two parts. There was a 2-milligram component that was entirely coated outside. Which was DR? Which was indisputably a DR portion. Right. And then buried within the 30 milligrams of immediate release in the sphere, there was a barrier, and then 8 more milligrams of material. Which is sustained release. Right. And the court's... And I didn't mean to trample on confidential information, but usually what's submitted to the FDA is not confidential, is it? I'm not sure what the status of their formulation is right now in terms of confidentiality at the FDA. Okay. But what the district court concluded, and there's been no allegation of clear error in this finding, is that the 2 plus 8 equals 10. And that the outer immediate release layer of 30 milligrams on the sphere plus the barrier that went around the 8 milligrams constituted a mechanism of delayed release such that it met the claim construction of not releasing immediately or promptly after oral administration. But isn't it accepted as a fact that this sustained release emptied into the stomach? Which means not delayed release? No, I don't believe so, Your Honor. What was found by the district court, and it's not challenged, as I understand it, as a factual finding, is that the 8 milligrams indisputably did not release promptly following oral administration. Because of the interposition of the outer layer and that other barrier. And the district court relied on the evidence presented by the experts, weighed the testimony of the experts, weighed all of the internal documentation that was presented as evidence during the trial. It came to that conclusion, and there's no clear error in that finding. Your Honor, sticking with Chang, what Pallant is asking for would be extraordinary. Here, it's clear that the claim construction arguments and prior art distinctions that were made by the applicant during the IPR were rejected on their face thoroughly. How do you distinguish American prior art? Well, I distinguish it, I think, on that basis. It's not, it wasn't a case where a claim construction that was erroneously urged and then rejected by the patent office was then forced upon the applicant. Actually, it was. I mean, it's a claim construction case, and the term was integral. So American prior driving unambiguously argued, I'm actually quoting from the case, argued that integral meant one piece during the examination, cannot attempt to distance itself from the disavowal of broader scope, is what they said. And they said that, you know, the patent office had said that they weren't going to give integral the one piece definition. So how do I distinguish that? I think on the basis that the intrinsic evidence in that case supported the claim construction in the position that was being urged by the applicant as well. Here, though, you know, it's kind of weird to take that as your distinction when what we're talking about isn't claim construction. We're talking about DOE and whether statements that a patent owner makes during prosecution, and we've said that IPRs or statements made during IPRs are statements that are akin to statements made during other types of prosecution, and that the patent owner is bound by those. But here, I think that the primary distinction is that no reasonable competitor could rely on those statements made by the applicant when they were clearly and soundly rejected by the board. Well, in this case, in American Piledriving, the patent office rejected the claim construction offered by the patent owner as well. Yeah, and in that sense, though, but in this particular case, if we reach the other conclusion, we would have this anomalous situation where the patent applicant was held both to a rejected claim construction on one hand and to the correct claim construction on the other. So you're emphasizing that the district court here adopted the corrected construction, and nobody has challenged that on appeal? It is unchallenged on appeal, and it's the construction, therefore, that this court would apply. It's the lens through which this court would look when determining whether the district court committed any clear error in applying the facts. I have one more question for you, which is the same question that I had asked opposing counsel, which is, what options, if any, are there for somebody in a position like your client for correcting a claim construction position after the PTO or the board reject it during an IPR? I'm not aware of any, Your Honor. And in this particular instance, there would have been no need to do so in terms of public notice function because anyone reading the board's final written decision would see that that position was, that the applicant's statements were rejected and that the claims were distinguished from the art only on the same basis that they're rejected on and that they were rejected by in the district court, namely the actual correct claim construction. You could do a petition for rehearing, right? Is that only allowed by somebody who disagrees with the decision of the board? I mean, you're kind of in a weird situation. They didn't adopt your claim construction, but you still won. Right, and I don't think we had a right to petition for rehearing in that instance. I could be wrong, but I don't believe we did. And we did win ultimately on the merits, so we never would have taken that route. And I think the important point is that we actually did win and did distinguish the art ultimately in front of the board based on the claim construction that was adopted here that was applied correctly by the district court. And that's unchallenged here on appeal. Their position would also create an anomalous situation where the scope of equivalence would be narrower than literal infringement in this case, as opposed to an equitable... Why didn't you assert a literal infringement case here? Why didn't we? We were procedurally barred. We thought that we received evidence that showed that they literally infringed. And let's be honest here. The proofs, I think, at least the findings that the district court made, would suffice for literal infringement. He found that they had a delayed-release 10-milligram component. Is it just a question of timing in when you made your literal infringement case? Yes. We thought we got the evidence later in the game. We tried to amend our contentions. The judge disagreed and said, no, you're stuck with equivalence. Now, the proofs were sufficient to prove literal infringement and you see that in the judge's findings where he finds at A76 and A77 to 78... Is your argument basically that which literal infringes has to infringe under DOE, kind of like that which is anticipated has to be obvious? It's certainly at least the limit. It can't be narrower. They've sort of put the cart before the horse. They haven't urged a reversal in the claim construction, but they urge a stoppalse that would result in the anomalous position of equivalence being narrower. And that's not been the opinion of this court, nor has it been any of the precedent that I've reviewed. Just briefly again on Ashley... Well, actually, on the amendment-based stoppal, I think it's important just to address that briefly. It doesn't apply here because they fall literally within the territory consisting of a 10-milligram DR and a 30-milligram IR. The court so found under its unchallenged claim construction that they had those components. So even if we were limited to the territory that was not surrendered, they would fall within. But the amendment was also tangential, as this court recently found in its Eli Lilly case. It was tangential to anything having to do with the distinction that was being made in the prosecution record. It was made to distinguish high-dose prior art, which showed 100 to 200 milligrams of doxycycline being used. And that was clear in the record in both the responses of the applicant at A7763 and A7806-7, and in the reasons for allowance where the examiner made this very point at A7865, that the distinction was over high-dose doxycycline, nothing to do with the accused product here or any distinctions there. Counsel, as you can see, your red light is on. Do you have a final thought? Just a final thought on Ashley. Your Honors, there is particularized evidence, as I pointed out, some of it throughout the record. The evidence you were pointing to went to a different claim and a different element in that claim. It wasn't even the same claim language. It was presented in the context of a different element, which encompassed the no reduction in skin microflora point, because it involved four areas, including the skin. And the primary evidence that was presented throughout the record... It was evidence presented by your expert when speaking about a different claim, possibly in a whole different patent, or was it the same exact patent? I don't even remember, but totally different claim. It wasn't presented with relevance to this claim or this element. The element was in both sets of patents, the no reduction in skin microflora. He was not testifying as to the reduction in skin flora, was he, in that particular place? Respectfully, yes, Your Honor. That's exactly what he was testifying about. He said, with regard to Skidmore, which is a skin microflora study, that there was essentially no difference, that it showed that it had no significant difference between placebo, with regard to placebo. That is exactly the no reduction in skin microflora term as it was construed by the district court. And that is... the record is replete with that. A5465, page 171. A5477, page 221. Thank you, counsel. I think we have your answer. Yes, Your Honor. Mr. Lombardi has some rebuttal time. Thank you, Your Honor. With respect to Ashley 2, Your Honor has it right. There is no particularized finding. There is nothing there that indicates that any of the quotations that he read from relates to Ashley 2 or a doctrinal equivalence finding. So we're in a situation where the burden apparently, according to my colleague on the other side, is on us to have gleaned from this record that we should have responded to a theory that they did not raise. I did want to address the point about the pretrial order. That was the A4540 reference. What also happened in the trial court was that my colleague argued in another context that a pretrial order does not constitute trying the case, and that's at A568. So he said that merely saying that you're going to address this in the pretrial order... Maybe what I'm saying, I'm going to argue DOE with regard to claims in a particular patent is particularized evidence and testimony with regard to precise elements in a precise claim. Correct, correct. And A568 confirms, I believe, that they've admitted that. With respect to Chang, Your Honor, I understood counsel to concede that there is an IR, a DR, and a SR, sustained-release portion of the amnio product. That takes it beyond the scope of the consisting-of language of the claims, which was just DR and IR. And, Your Honor, with respect generally to prosecution history estoppel, Your Honor, I do believe that this is a classic case of where prosecution history estoppel should operate. I understand that the PTAB ruled against them. However, they're responsible for the statements that they make. They're on notice that statements they make in the public record are used by competitors to determine what their product can be. That's exactly what happened with amnio, which redesigned its product after the PTAB. What did the PTAB say, in effect, concerning the distinction between sustained and delayed release? With respect to sustained and delayed release, they said that anything that did not... that released immediately... sustained release started to release immediately, and so, therefore, wasn't delayed release. That's what the PTAB said. Thank you, Your Honor. Thank you, counsel. Case is submitted.